UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ASMA YUSUF | CASE NO. 1:17CV2292 |
| Plaintiff | |
| | MAGISTRATE JUDGE |
| v. | GEORGE J. LIMBERT |
| NANCY A. BERRYHILL | |
| ACTING COMMISSIONER OF SOCIAL | MEMORANDUM OPINION |
| SECURITY ADMINISTRATION | AND ORDER |
| Defendant | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security Administration denying Asma Yusuf Disability Insurance Benefits (DIB). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his August 29, 2016 decision in finding that Plaintiff was not disabled because she could perform a reduced range of light work (Tr. 11-21). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I. PROCEDURAL HISTORY

Plaintiff, Asma Yusuf, filed her application for DIB on January 14, 2014, alleging she became disabled on December 31, 2010 (Tr. 87, 178).[1] Plaintiff's application was denied initially and on reconsideration (Tr. 106-109, 116-118). Plaintiff requested a hearing before an ALJ, and on January 12, 2016, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ, as well as a vocational expert, who also testified (Tr. 27-76).

On August 29, 2016, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 13-21). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-5). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Sections 405(g) and 383(c).

---

[1]Despite these alleged onset dates, the relevant period here is actually September 25, 2013, through the date of the ALJ's decision, because Plaintiff's prior application for benefits was denied on September 24, 2013, she did not appeal, and the ALJ found that there was no basis for reopening that decision, which Plaintiff does not challenge (Tr. 11).

## II. PERSONAL INFORMATION

Plaintiff was born on May 25, 1965, and was, therefore, forty-five years old on her alleged disability onset date (Tr. 19). The claimant subsequently changed age category to closely approach advanced age (Tr. 19). She has a high school education (Tr. 19), and was found to have past relevant work as a department manager and a stock clerk (Tr. 66-67).

## III. SUMMARY OF MEDICAL EVIDENCE

Prior to her alleged onset date, in June 2012, Plaintiff underwent an MRI of the lumbar spine that revealed an L2-L3 diffuse disc bulge and facet hypertrophy resulting in moderate spinal stenosis, and an L3-4 diffuse disc bulge, with a protruded portion 3 to 4 mm, and facet hypertrophy resulting in moderate to severe spinal stenosis (Tr. 303-304). MRI testing of the lumbar spine completed in December 2012 revealed mild distal lumbar spondylosis, L3-4 bulging with possible impingement of the descending L4 nerve root, congenital narrowing of L5-S1, and left side down pelvic tilt (Tr. 282-284).

Physical examinations in May and June 2013 revealed tenderness to palpation of every joint and "all her tender points are present" (Tr. 292). On May 24, 2013, blood tests showed Plaintiff to have an abnormal C Reactive Protein (CRP) value of 1.2 (normal 0.0 - 1.0 mg/dl) (Tr. 294-295). A diagnoses of suspected fibromyalgia was proffered (Tr. 292). Plaintiff underwent L3-4, L4-5, L5-S1 zygapophyseal injections (Tr. 462).

On December 15, 2013, Plaintiff received treatment at the Fairview Hospital emergency room for complaints of flu-like symptoms, and was diagnosed with bronchitis (Tr. 338). On January 22, 2014, Plaintiff received treatment from Dr. Kenneth Grimm, a pain management specialist (Tr. 303). Plaintiff was noted to have undergone L3-4 and L5-S1 zygapophyseal injections with only two months of pain relief (Tr. 303). Physical examination revealed an antiverted pelvis and facet joint tenderness at L3-4 (Tr. 305). Plaintiff agreed to repeat L3-4 and L5-S1 zygapophyseal injections (Tr. 305). Shortly after, on February 10, 2014, Plaintiff underwent L3-4, L4-5, L5-S1 zygapophyseal injections (Tr. 462).

On March 23, 2014, Plaintiff received medical care from Dr. Emad Sedki, her primary care physician, for complaints of migraine headaches of two weeks' duration (Tr. 507). Plaintiff said that

her migraine medication, Compazine, was only minimally helping (Tr. 507). Plaintiff was diagnosed with severe headaches and referred for an MRI of the brain (Tr. 508). MRI testing of Plaintiff's brain completed on March 20, 2014, and was interpreted as normal (Tr. 542). On March 26, 2014, Dr. Sedki ordered a stress test due to Plaintiff's complaints of chest pain and dizziness (Tr. 514). The same day, Plaintiff presented for medical care to Joanne Schneider, DNP, RN, CNP, with the Cleveland Clinic Neurological Center for Pain Evaluation, at the request of Dr. Grimm, for an evaluation for admission into the Chronic Pain Rehabilitation Program (Tr. 476). Plaintiff complained of migraine headaches and constant whole body pain, worse in the legs and back (Tr. 476). Physical examination revealed major loss of cervical range of motion in all plains with a moderate loss of lumbar flexion and extension, and tenderness everywhere she was touched in the extremities and the back (Tr. 478). Plaintiff was diagnosed with fibromyalgia and migraine headaches and offered participation in the Chronic Pain Rehabilitation Program (Tr. 478).

Echocardiogram stress testing completed on March 28, 2014 was non-diagnostic due to a sub-optimal heart rate (Tr. 520). Shortly after, on March 31, 2014, Plaintiff underwent a functional capacity evaluation at the request of Dr. Emad Sedki (Tr. 485). Testing revealed she was limited bilaterally to no frequent lifting and only occasionally lifting ten pounds (Tr. 487). Plaintiff was found to retain the ability to perform sedentary work due to her performance of lifting tasks and walking speed (Tr. 487-488). Mr. Wallis based his assessment of sedentary work with the understanding that there is no requirement for frequent lifting and no specific requirement for standing, walking, or carrying (Tr. 488).

On April 5, 2014, Dr. Emad Sedki completed a physical residual functional capacity evaluating, finding Plaintiff limited to: lifting five pounds frequently, ten pounds occasionally; standing and walking four hours out of an eight-hour day, half an hour without interruption; sitting four to five hours in an eight-hour day, two hours without interruption; rarely climbing, balancing, stooping, kneeling, crouching, crawling, reaching and pushing and pulling; avoiding heights, moving machinery, and temperature extremes (Tr. 493-494). Plaintiff was also found to need to elevate her legs to forty-five degrees at will; would require one hour of additional rest breaks per workday;

-3-

would require a sit, stand, walk at will option; and have severe pain that interferes with her concentration, takes her off task, and would cause absenteeism (Tr. 494).

On April 23, 2014, Plaintiff underwent a consultative examination with Dr. Hasan Assaf, at the request of the Social Security Administration (Tr. 496). Dr. Assaf performed a physical examination, and concluded that Plaintiff should avoid exposure to dust and other industrial pollutants, and would have marked limitations with prolonged standing, walking, bending, and lifting (Tr. 500).

On May 5, 2014, Plaintiff sought emergency room care for complaints of chronic back pain with numbness in both hands and both feet, and radiating pain down her left leg (Tr. 546). Plaintiff was given an injection of Norflex, Toradol, and peel Ultram, and was diagnosed with chronic low back pain with left leg sciatica (Tr. 547).

On that same date, Dr. Stephen Sutherland completed a non-examining assessment of Plaintiff's physical abilities at the request of Social Security (Tr. 83-84). Dr. Sutherland concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand/walk four hours ina n eight-hour day, a maximum of thirty minutes in one hour; occasional use of pedals with bilateral feet; no push/pull in lower extremities; occasional climbing ramps/stairs; never climb ladders, ropes, or scaffolds; occasional stooping, kneeling, and crawling; frequent balancing, crouching; and avoid fumes, odors, dusts, gases, poor ventilation (Tr. 83-84). A finding was made that Plaintiff ws limited to sedentary work (Tr. 86).

On May 23, 2014, Plaintiff reported to Dr. Sedki that she had not experienced headaches for two weeks, and requested a second opinion from a spine specialist for her back pain (Tr. 524). Plaintiff was given a referral for a spine specialist and lumbar x-rays (Tr. 524). X-ray testing performed on May 27, 2014 revealed lumbar degenerative disc disease, including marked narrowing at L5-S1 posteriorly, unchanged since her last exam (Tr. 528).

On July 7, 2014, Plaintiff sought emergency room care for complaints of a migraine headache and neck pain of two days' duration (Tr. 647, 715). Physical examination revealed cervical muscle tenderness. Plaintiff was diagnosed with a cervical strain and migraine headache (Tr. 648-649). Shortly after, on July 18, 2014, Plaintiff was examined by spine surgeon Dr. Tagreed Khalaf, at the

request of Dr. Sedki (Tr. 669). Plaintiff complained of diffuse neck pain, right upper extremity pain and numbness of the hand, low back pain, and left lower extremity pain (Tr. 669). MRI testing was reviewed, and a physical examination revealed limited spine range of motion, diffuse tenderness to palpation, and decreased bilateral upper and lower extremity coordination and muscle stretch reflexes (Tr. 671). Plaintiff was diagnosed with chronic neck, right upper extremity, low back, and left lower extremity pain (Tr. 671). Plaintiff was prescribed land and aquatic physical therapy and a trial of Mobic (Tr. 672). Plaintiff was not interested in surgery (Tr. 671).

On August 19, 2014, Dr. Srenivas Venkatachala reassessed Plaintiff's physical abilities, at the request of Social Security, and concurred with Dr. Sutherland, except for finding Plaintiff limited to frequent kneeling, instead of occasional (Tr. 100). Plaintiff was again adjudicated limited to sedentary work (Tr. 101).

On September 4, 2014, Plaintiff sought emergency room care for left eye irritation and crusting, ear pain, and daily migraine headaches (Tr. 730). Plaintiff was diagnosed with conjunctivitis of the left eye and otalgia of both ears (Tr. 732). Eleven days later, on September 15, 2014, Plaintiff underwent a physical therapy low back evaluation, and was noted to have a leg length discrepancy, left leg shorter than right (greater than one inch), that causes a gait deviation that may be contributing to her leg and foot symptoms (Tr. 740, 743, 760).

On September 22, 2014, Plaintiff sought emergency room care for complaints of left ankle and calf edema of three months' duration, and was diagnosed with leg pain (Tr. 748, 751). Plaintiff continued physical therapy on February 25, 2014, and was prescribed a lift for her left shoe (Tr. 760). Blood testing performed on September 30, 2014 revealed an abnormal CRP value of 1.3 (normal 0.0-1.0 mg/dl) and an abnormal Westergren Sedimentation Rate (WSR) value of 29 (normal 0-15 mm/hr) (Tr. 771-772).

On September 29, 2014, Plaintiff established care with Dr. Sunir Kumar as her primary care physician (Tr. 762). Plaintiff complained of low back pain, bilateral leg and ankle swelling, migraine headaches, and hand swelling (Tr. 762). Dr. Kumar encouraged Plaintiff to elevate her legs and wear compression stockings (Tr. 765).

On October 9, 2014 and October 29, 2014, Plaintiff had a lipoma surgically removed from her left upper lateral arm (Tr. 784, 925). On October 21, 2014, Plaintiff sought emergency room care for complaints of chronic low back pain that had worsened over the prior week (Tr. 932). She was diagnosed with an exacerbation of chronic back pain and leg swelling, and was given Norco, a narcotic, and Flexeril, a muscle relaxer (Tr. 934, 936).

On November 21, 2014, Plaintiff underwent a rheumatological consultation with Dr. Feyrouz T. Al-Ashkar, at the request of Dr. Kumar (Tr. 811). Plaintiff complained of left knee pains and a history of leg and hand swelling (Tr. 812). Dr. Al-Ashkar found no evidence of rheumatologic disease, but ordered blood testing, including uric acid levels and lupus testing, x-rays of the knees and hands, consults with occupational, massage, and physical therapy, and a left leg venous ultrasound (Tr. 817). Dr. Al-Ashkar opined that Plaintiff's arthralgias/myalgias, muscle cramps, and fatigue may be caused by her Vitamin D deficiency (Tr. 818). X-ray testing of Plaintiff's knee on November 21, 2014 revealed osteopenia and tiny lateral compartment osteophytes of the right knee (Tr. 827). X-rays of the bilateral hands, as well as an ultrasound of the left lower extremity performed on the same date, were interpreted as normal (Tr. 828).

On November 24, 2014, Plaintiff returned to Dr. Khalaf with ongoing complaints of chronic low back, neck, left lower extremity, and bilateral upper extremity pain (Tr. 909). Plaintiff said that she was unable to start Topamax, because it was too expensive and she had no insurance coverage (Tr. 909). Plaintiff was diagnosed with chronic back and left lower extremity pain, lumbar and cervical spondylosis without myelopathy, and chronic neck pain and hand tingling (Tr. 910). Plaintiff was referred for bilateral upper extremity EMG testing (Tr. 910). EMG testing completed on November 25, 2014 was limited, due to pain, and was interpreted as normal (Tr. 916).

On December 9, 2014, Plaintiff began occupational and physical therapy, and was noted to have chronic pain in the left knee and ankle with painful and reduced extension and flexion of the left knee, pain at the pateller tendon, and tightness of the iliotibial band and quad (Tr. 831, 837). Plaintiff was also diagnosed with carpal tunnel syndrome, and given bilateral wrist splints (Tr. 839). Plaintiff returned to occupational therapy on December 22, 2014, and complained of pain in her

-6-

wrists with daily activities (Tr. 845). Plaintiff also received physical therapy on December 15, 2014 (Tr. 848).

On January 12, 2015, Plaintiff returned to Dr. Kumar for a comprehensive assessment, and requested to be referred to a new back specialist for further evaluation, since her prior back specialist was no longer working with the Cleveland Clinic (Tr. 855). Physical examination of Plaintiff revealed limited flexion and extension of the back, due to pain, lumbar lordosis, and lumbar paraspinal tenderness (Tr. 857). Dr. Kumar referred Plaintiff for a consult to the spine center (Tr. 857).

On February 17, 2015, Plaintiff was examined by Dr. Santhosh Thomas of the Cleveland Clinic Spine Center, at the request of Dr. Kumar (Tr. 873). MRI testing of the lumbar and cervical spine completed on November 5, 2014 revealed a C3-4 osteophyte and mild to severe bilateral foraminal narrowing from C3-4 to C6-7 and L3-4 and L4-5 central stenosis, due to bulging and facet hypertrophy, and mild to moderate foraminal narrowing (Tr. 877). Physical examination revealed limited range of motion of the cervical spine, shoulder, hip, and lumbar spine, and 4/5 strength of the upper and lower extremities (Tr. 876-877). Dr. Thomas diagnosed lumbar and cervical spondylosis, myofascial pain syndrome, lumbar foraminal stenosis, and chronic pain (Tr. 878). Dr. Thomas prescribed physical therapy and tens unit, and instructed Plaintiff to follow-up with Dr. Grimm, who she had mistakenly thought had left the Cleveland Clinic (Tr. 878). On March 5, 2015, Plaintiff returned to physical therapy (Tr. 884).

On May 5, 2014, Plaintiff returned to Dr. Kumar for complaints of edema, poor concentration, and headache (Tr. 890). Plaintiff said that the swelling in her legs goes down if she elevates her legs, that her migraines were worsening, and that she wanted to see another pain management specialist other than Dr. Grimm (Tr. 890).

On August 8, 2015, Plaintiff sought emergency room care for complaints of left ear and knee pain, and because her left knee was "giving out" (Tr. 962). Physical examination revealed left knee edema and tenderness of the medial joint line and patellar tendon (Tr. 964). X-ray testing of Plaintiff's left knee revealed questionable small left knee effusion, and she was given a knee brace, a morphine injection, and a prescription for Percocet (Tr. 965, 969, 971).

-7-

On August 24, 2015, following up for an emergency room visit for the same complaints, Plaintiff returned to Dr. Kumar with complaints of left knee pain and the knee giving out (Tr. 901). Physical examination revealed swelling of the left knee and pain with extension and flexion (Tr. 903). Dr. Kumar referred Plaintiff for an orthopedic consult for her left knee (Tr. 903). Dr. Kumar also completed a medical source statement regarding Plaintiff's mental functioning, finding her to have no limitations (Tr. 790). Physical examination revealed bilateral lower extremity varicose veins (Tr. 892). Plaintiff was referred to a new pain management specialist and to a vascular specialist (Tr. 893). Plaintiff was also advised to elevate her legs as much as possible, and to wear compression stockings (Tr. 893).

On October 26, 2015, Plaintiff underwent physical therapy for her left knee (Tr. 990). Shortly after, on November 9, 2015, Plaintiff underwent a physical therapy evaluation for her low back pain (Tr. 994). Plaintiff complained of pain, and was found to have an antalgic gait (Tr. 997). Plaintiff was found to be unable to do aquatic therapy for cultural reasons, and was in too much pain to do land physical therapy (Tr. 997).

On January 7, 2016, Plaintiff returned to Dr. Kumar with complaints of back pain with fifty percent relief following an injection the previous day, and right shoulder and neck pain (Tr. 1001). Physical examination revealed cervical tenderness and pain in her right sternoclavicular joint, deltoid region and scapular region (Tr. 1003). Testing included Speed's test, empty can test, Yocum test, and Hawkins testing, all positive on the right side (Tr. 1003). Dr. Kumar prescribed x-ray testing of the right shoulder and cervical spine (Tr. 1003). Dr. Kumar wrote a letter, stating that Plaintiff had been off of work for three weeks' duration due to back issues, had undergone an injection on January 6, 2016 that provided some relief, and was scheduled to start physical therapy (Tr. 989).

X-ray testing on January 7, 2016 showed a normal cervical spine (Tr. 1009-1010). Right shoulder x-rays revealed minimal degenerative changes of the acromioclavicular joint (Tr. 1010-1011). The next day, on January 8, 2016, Plaintiff began physical therapy for her neck and right shoulder (Tr. 1012).

## IV. **SUMMARY OF TESTIMONY**

At her hearing, Plaintiff testified to having primarily lower back pain that she rated a six or

-8-

seven out of ten (Tr. 39). Plaintiff testified that she began having neck and back pain in 2010 that caused her to be limited to part-time work (Tr. 42, 44). She testified that her pain has worsened since 2012, when she injured her back lifting furniture at work (Tr. 37, 44). Due to her pain, Plaintiff stated that she can walk for two to two and one-half hours before she would start limping and need to sit down (Tr. 51), and that her pain limits her to doing small chores while taking breaks (Tr. 52-53). In regards to her neck, Plaintiff rated her pain a five to six out of ten, and stated that her neck pain caused migraine headaches (Tr. 44-45). She testified that she had in the past had migraines about four to five times a week, and currently had them reduced to two to three times a week, lasting two to three hours, due to her prescription for Topamax (Tr. 45-46). Specifically, when having a migraine, Plaintiff stated that she has an aura of nausea and has to stay in a dark room (Tr. 47), and that light from a computer screen, or in an office, or even at Big Lots, hurt her eyes (Tr. 59-60).

Plaintiff testified that she experiences swelling in her feet, as well as a sensation of walking on needles, that were not helped by physical therapy and causes her to elevate her legs when sitting (Tr. 49-50). Plaintiff also testified that she has swelling in her bilateral hands that make it difficult to operate her hands (Tr. 60).

At the time of her hearing, Plaintiff testified that she had been working part-time (twelve hours per week) at Big Lots for three years (Tr. 36). Plaintiff works three days per week, not consecutively, for four hours (Tr. 36, 65). She testified that she has to work part-time in order to get treatment at the Cleveland Clinic (Tr. 62-63), and that she has an understanding manager who allows her to take off work when she is in pain (Tr. 38). Also, Plaintiff's manager allows her to go home from work when she is having a migraine (Tr. 48). She testified that after twelve hours of work activity in one week, she is exhausted and has an increase in her pain that causes her to need to elevate her legs (Tr. 53-55). She stated that she has frequently been absent from work due to pain (Tr. 58-59). Plaintiff also testified that work causes her hand to swell and makes it difficult to use a cash register (Tr. 61, 64).

Plaintiff testified that she takes pain medications, such as Gabapentin, Neurontin, and Cyclobenzapine, which helps, but does not resolve her pain (Tr. 39-40), but also causes her to be

-9-

"out of it" (Tr. 40). In addition, Plaintiff testified that she has undergone injections and uses a tens unit to help treat her pain (Tr. 56). She testified, however, that her last injection caused an increase in pain, that caused her to miss three weeks of work (Tr. 58).

Deborah Lee, the vocational expert, testified that Plaintiff has past relevant work as a department manager and a stock clerk (Tr. 66-67). However, Ms. Lee testified that Plaintiff's past relevant work did not give her any transferable skills (Tr. 71). When asked to consider the limitatons opined by Dr. Sedki on April 15, 2014, Ms. Lee testified that there would be no jobs that Plaintiff could perform (Tr. 73-74). Further, Ms. Lee testified that if Plaintiff was off task fifteen percent or more of the workday, required an additional one hour of breaks per day, or would need the ability to leave work when feeling ill at will, there would be no work that she could perform without an accommodation (Tr. 74-75).

## V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters*, 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VII. STATEMENT OF ISSUES AND ANALYSIS

Plaintiff asserts one assignment of error:

THE ALJ ERRED IN GIVING "LIMITED WEIGHT" TO THE OPINIONS OF PLAINTIFF'S TREATING PHYSICIAN DR. EMAD SEDKI, CONSULTATIVE EXAMINER DR. HASAN ASSAF, AND PHYSICAL THERAPIST RICHARD WALLIS.

The Court finds that the ALJ correctly adopted Dr. Sedki's opinion that Plaintiff should be limited to four hours of standing or walking, and also correctly determined that the remainder of Dr. Sedki's opinions were inconsistent with the weight of the evidence, and, therefore, entitled to limited weight. The ALJ also correctly considered the opinions offered by consultative examiner Dr. Assaf, and reasonably concluded that those opinions were not well supported and were not supported by

-11-

other evidence, and, therefore, were entitled to only limited weight. Finally, the Court finds that the ALJ correctly considered the opinions offered by physical therapist Mr. Wallis, and reasonably concluded they were entitled to limited weight.

The ALJ adequately considered and weighed opinions offered by Plaintiff's primary care physician Dr. Sedki (Tr. 19). A treating physician's opinion is entitled to controlling weight only if it is well supported by medically-acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Social Security Ruling (SSR) 96-2p, 1996 WL 374188.[2] An ALJ may properly discredit the medical opinion of a treating physician so long as he provides "good reasons" for doing so. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (affirming ALJ's decision because he gave "good reasons" for discounting treating physician's questionnaire responses); *see, also*, 20 C.F.R. § 404.1528(c)(2); SSR 96-2p. "Good reasons" include, among others, that a treating source opinion was not well supported by medical findings or was inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(2)-(4).

The ALJ correctly determined that a portion of Dr. Sedki's opinions was consistent with other evidence in the record, and, therefore, adopted that portion in the residual functional capacity finding (Tr. 19) (limiting Plaintiff to four hours of standing and walking); 493. However, the ALJ found that the remainder of Dr. Sedki's opinions were inconsistent with other evidence, and, therefore, entitled to limited weight (Tr. 19; § 404.1527(c)(2)-(4)). The evidence indicated that Plaintiff could stand for about four hours during a workday (and, in fact, did stand for four hours at a time for her part-time work) (Tr. 36, 485). That evidence supported Dr. Sedki's opinion regarding Plaintiff's ability to stand and walk (Tr. 493). However, the ALJ explained that the weight of the evidence supported a finding that Plaintiff could perform light, rather than sedentary, work, thereby

---

[2]On March 27, 2017, new Social Security regulations went into effect abolishing the "treating physician" rule, rescinding several rulings (SSR 96-2p, 96-5p, 96-6p), and reinforcing that the ALJ need discuss only those regulatory factors that are relevant to his decision. 82 FR 5844-84 (Jan. 18, 2017) (effective date March 27, 2017). These new regulations and accompanying Social Security Rulings, however, are prospective and do not apply to this case.

diminishing the weight assigned to the remainder of Dr. Sedki's opinions (Tr. 19). He provided this explanation after a review of the evidence and assessment of other medical opinions in the record, and his conclusion regarding the weight assigned to Dr. Sedki's opinions was correct (Tr. 13-19). The ALJ's decision also shows that he discussed other record evidence that did not support the remainder of Dr. Sedki's opinion, including physical examination findings. The ALJ had also considered evidence demonstrating that, although Plaintiff had slightly abnormal gait, the medical records did not reflect significant gait, ambulation, or balance problems, and reflected full or nearly full strength (Tr. 16-18, 478, 498-500, 515, 549, 677). In addition, the ALJ had explained that Mr. Wallis' opinion, to which Dr. Sedki repeatedly referred in his opinion, was flawed, because he simultaneously opined that Plaintiff should be limited to sedentary work, and affirmed that she could perform her current light work (Tr. 18, 488); *see infra* Section III. Further, the ALJ was not required to discuss and cite every single piece of evidence. *See, Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x, 496, 508 (6th Cir. February 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.")

The ALJ correctly assessed Dr. Sedki's opinions, accepting a portion of those opinions, but assigning limited weight to the remainder. He adequately explained the reasons for his assessment. Thus, the ALJ's assessment of Dr. Sedki's opinions support affirming the ALJ's decision.

The ALJ also correctly assigned limited weight to the opinions offered by consultative examiner Dr. Assaf (Tr. 18). The ALJ noted the generally mild results of Dr. Assaf's examination, including that Dr. Assaf observed a mild limp and measured only slightly reduced range of motion in Plaintiff's spine (Tr. 18, 499, 503-505). The ALJ also noted that Plaintiff reported no problems with daily activities, despite her complaints of shortness of breath and severe back pain (Tr. 18, 496, 498). The ALJ considered that, notwithstanding these relatively benign findings, Dr. Assaf opined that Plaintiff experienced marked limitations in activities requiring prolonged standing, walking, bending, and lifting (Tr. 18, 500).

The ALJ assigned Dr. Assaf's opinions limited weight, because they were inconsistent with and not supported by the weight of the evidence (Tr. 18-19); 20 C.F.R. § 404.1527(c)(3), (4). The ALJ explained inconsistencies between Dr. Assaf's physical examination results and his opinion (Tr. 18). Though Dr. Assaf observed only a mild limp and acknowledged that Plaintiff did not need any type of assistive device to walk, he, nonetheless, opined that she had marked limitations in walking (Tr. 18-19, 499). Though Dr. Assaf noted that Plaintiff did not need any assistance to get on or off the exam table, and had only slightly reduced range of motion in her dorsolumbar spine and on flexion of her knee (and normal range of motion in all other joints tested), he, nevertheless, opined that she had marked limitations in bending and lifting (Tr. 18-19, 499, 503-505). The ALJ appropriately considered that Dr. Assaf's opinions were inconsistent with and unsupported by his own exam notes. 20 C.F.R. § 404.1527(c)(3), (4).

The ALJ also correctly determined that the weight of the remainder of the evidence did not support Dr. Assaf's opinion of Plaintiff's limitations (Tr. 19); 20 C.F.R. § 404.1527(c)(3), (4).

Based upon the evidence, the ALJ correctly considered that Dr. Assaf's opinions were inconsistent with evidence of generally mild gait disturbances, no indication of balance problems, and full or nearly full strength (Tr. 16-18, 478, 515, 549, 677).

In addition, the ALJ noted that Dr. Assaf's opinions appeared to be based on subjective reports from Plaintiff, which was another reason to discount the opinions. *See, e.g., Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004).

Hence, the ALJ correctly assigned limited weight to Dr. Assaf's opinions.

Finally, the ALJ correctly considered the opinions offered by physical therapist Mr. Wallis (Tr. 18). Mr. Wallis recorded Plaintiff's report that during an eight-hour workday, she could stand for four hours, sit for three hours, and walk for five hours (Tr. 485). He then performed a series of strength and mobility tests, with results ranging from normal to "very below normal limits" (Tr. 486-488). Mr. Wallis concluded his report by opining both that Plaintiff could perform the essential duties of her job as a cashier, but not her prior job of loading and unloading, and that she could perform work at the sedentary level (Tr. 488). The ALJ rejected Mr. Wallis' conclusion that Plaintiff could perform only sedentary work, because it contradicted his opinion that she could perform her

work as a cashier, which was light work (Tr. 18). As a matter of fact, Mr. Wallis recorded that Plaintiff's cashier work required long periods of standing (Tr. 485). The ALJ correctly concluded that there was a conflict between two opinions that Plaintiff could perform her current light work job and she was limited to performing sedentary work. The ALJ properly determined that the internal conflict in Mr. Wallis' opinions demonstrated that they were entitled to limited weight (Tr. 18); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006).

The ALJ also correctly decided that Mr. Wallis was not an acceptable medical source, as defined by the regulations (Tr. 20); 20 C.F.R. § 404.1513(a); SSR 06-3p, 2006 WL 2329939. However, the ALJ did not err in considering Mr. Wallis' opinions.

The ALJ gave appropriate reasons for the weight assigned to each of the above-discussed opinions pursuant to the regulations and rulings. *Collins v. Comm'r of Soc. Sec.*, 375 F.App'x 663, 668 (6th Cir. 2009). Therefore, substantial evidence supported the ALJ's assessment of the medical opinions.

## VI. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a reduced range of light work, and, therefore, was not disabled. Hence, she is not entitled to DIB.

Date:  January 30, 2019
/s/George J. Limbert
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE